O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTES AUTOMOTIVE GROUP, INC. DBA MERCED HYUNDAI, ESTES HOLDING COMPANY LLC, JIM ESTES, AND CARL SCHNEIDER,<br><br>Plaintiffs,<br><br>vs.<br><br>HYUNDAI MOTOR AMERICA, HYUNDAI CAPITAL AMERICA, JOHN MORIARTY, AND SAM FROBE,<br><br>Defendants. | CASE NO. 8:10-CV-00287-JST (RNBx)<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' FIRST CLAIM AND DISMISSING PLAINTIFFS' SECOND, THIRD, FOURTH, FIFTH, SIXTH, AND SEVENTH CLAIMS** |

Plaintiffs Jim Estes ("Estes"), Carl Schneider, Estes Holding Company, LLC, and Estes Automotive Group (collectively "Plaintiffs") filed suit against Defendants Hyundai Motor America ("HMA"), Hyundai Capital America ("HCA"), John Moriarty, and Sam Frobe (collectively "Defendants"), asserting seven claims.[1] HMA and HCA each filed a motion for summary judgment.[2] For the reasons set forth below, the Court GRANTS Defendants' Motions for Summary Judgment as to the first claim under the Automobile Dealer's Day in Court Act and DISMISSES the six remaining claims.

### I. Background

In 2002, Plaintiffs Jim Estes and Carl Schneider jointly purchased Merced Hyundai, a Hyundai dealership located in Merced, California. (Decl. of Jim Estes ("Estes Decl."), Doc. 63, ¶ 5.) In 2007, Merced Hyundai moved into a new facility that Plaintiffs financed through HCA in the form of a construction loan. (HCA's Reply Facts, Doc. 74, ¶ 14; Estes Decl. ¶ 19.) At the same time, Plaintiffs entered into another loan agreement with HCA whereby HCA provided floor plan financing. (Estes Decl. ¶ 20.)

In 2008 and into 2009, Merced Hyundai's profits slipped and Plaintiffs sought financial assistance from Defendants. (Estes Decl. ¶¶ 26, 30-33.) On January 30, 2009, Estes sent a letter to HCA Senior Dealer Credit Analyst Shelley Cain requesting a six-month forbearance on the construction loan. (HCA's Reply Facts ¶ 20.) Thereafter, beginning in February 2009 and continuing through January 2010, Plaintiffs and Defendants engaged in discussions about financial assistance that Defendants could provide Plaintiffs. (HCA's Reply Facts ¶¶ 22, 25, 30, 39-41, 46; Estes Decl. ¶¶ 30-43.)

---

[1] Plaintiffs do not make specific allegations against Moriarty or Frobe apart from those allegations against their employer, Hyundai Capital America. Accordingly, the Court addresses them collectively as "HCA."

[2] HMA also joined the Motion for Summary Judgment filed by HCA. (Doc. 42.)

2

By August 2009, Plaintiffs were sixty to ninety days behind on their mortgage payments to HCA due to a lack of operating capital. (Estes Decl. ¶ 41.)

On January 21, 2010, HCA served Plaintiffs with a Secondary Notice of Default and Acceleration of Debt on both the floor plan financing and the construction loan, demanding full payment of the $5,638,935.00 outstanding on the loans. (HCA's Reply Facts ¶¶ 83-84.) Plaintiffs closed Merced Hyundai on January 25, 2010. (*Id.* ¶ 86.)

**II. Legal Standard**

In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to particular materials in the record or showing that the materials cited do not establish that absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Reference to the record may include citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set out specific facts showing a genuine issue for trial. *Id.*

## III. Discussion

### A. Evidentiary Objections

A party asserting that a fact is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, affidavits, declarations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Defendants object to nearly all of Estes' Declaration. (*See* HCA's Evidentiary Objections, Doc. 75; HMA's Evidentiary Objections, Doc. 71.) Defendants object that the evidence is irrelevant, immaterial, conclusory, self-serving, lacking in foundation, hearsay, and barred by the Parol Evidence Rule. The paragraphs that are relevant to Plaintiffs' claims appear to be admissible, because they are based upon Estes' personal knowledge and are either "not hearsay" under the hearsay rule, or qualify as exceptions to the hearsay rule.[3]

HCA also objects to a portion of John Moriarty's deposition and an exhibit that discusses a real estate appraisal, both included in the declaration of A. Sasha Frid. (*See*

---

[3] "Parol evidence is inadmissible only if it 'contradicts' the integrated written agreement." *Furla v. Jon Douglas Co.*, 76 Cal. Rptr. 2d 911, 918 (Cal. Ct. App. 1998). "Obviously, however, [the Parol Evidence Rule] has no corresponding power to preclude future negotiations." *Hotle v. Miller*, 334 P.2d 849, 851 (Cal. 1959); *see also* Cal. Civ. Code § 1698(c) ("Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration."). Defendants' reliance upon the Parol Evidence Rule appears to be misplaced. Plaintiffs' allegations do not appear to contradict the terms of any integrated written agreement, rather Plaintiffs' claims focus on Defendants' representations subsequent to the formation of the contract.

Decl. of A. Sasha Frid, Doc. 62.) These objected-to pieces of evidence are neither necessary, nor helpful, to the resolution of the Motion.

Plaintiffs object to various portions of the declarations of Sam Frobe and Nhung Le (Pls.' HCA Evidentiary Objections, Doc. 57) and Eun Cho, Robert Kenney, and Anthony Sonnett (Pls.' HMA Evidentiary Objections, Doc. 60). The only relevant evidence from these declarations is Exhibit E from the declaration of Sam Frobe, which is the Assignment Agreement between Defendants and Plaintiffs. Plaintiffs object to Frobe's declaration, interpreting the Assignment Agreement, as an improper legal conclusion, lacking in foundation, lacking in personal knowledge, and hearsay and those objections are sustained. Plaintiffs do not appear, however, to object to or question the validity of the actual Assignment Agreement.

### B. Automobile Dealers' Day in Court Act

A claim under the Automobile Dealers' Day in Court Act requires coercion or intimidation and Plaintiffs have failed to offer proof of any act of coercion or intimidation by Defendants. Therefore, the Court GRANTS Defendants' Motions for Summary Judgment with respect to Plaintiffs' Automobile Dealers' Day in Court Act claim.

#### 1. Legal Standard

Under the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221-25, a franchised automobile dealer may sue in federal court "for the failure of the automobile manufacturer to act in good faith in performing or complying with any of the terms of provisions of the franchise, or in terminating, canceling, or not renewing the dealer's franchise." *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 910 (9th Cir. 1978).

> [F]ailure to exercise good faith within the meaning of the [ADDCA] has a limited and restricted meaning. It is not to be construed liberally. . . . The existence or nonexistence of "good faith" must be determined in the context of actual or threatened coercion or intimidation. In order to lack good faith the manufacturer's actions must be unfair and inequitable in addition to being for the purpose of coercion and intimidation. Coercion or intimidation must include a wrongful demand which will result in sanctions if not complied with, and it is necessary to consider not only whether the manufacturer brought pressure to bear on the dealer, but also his reason for doing so. When a termination or nonrenewal of a franchise is involved, there must be a "causal connection" between the dealer's resistance to the coercive conduct and the termination or nonrenewal for there to be a lack of good faith under the [ADDCA].

*Id.* at 911 (internal citations omitted).

### 2. HMA May Be Sued Under the ADDCA

The ADDCA allows suits against an "automobile manufacturer." 15 U.S.C. § 1222. The term "automobile manufacturer" includes any "partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons," as well as "any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles." 15 U.S.C. § 1221. "HMA admits that it is engaged in the sale of Hyundai vehicle in the United States." (HMA Answer, Doc. 14, ¶ 84.) HMA also admits that it executed a franchise agreement with

Merced Hyundai that (1) appointed Merced Hyundai as an authorized Hyundai dealer; (2) governed the operation of the Merced Hyundai dealership; and (3) set forth the rights and obligations between HMA and Merced Hyundai. (*Id.* ¶ 83.) Moreover, HMA does not dispute that it falls within the definition of an "automobile manufacturer." (*See* HMA's Mot. for Summ. J., Doc. 39, at 13-14.) Given this, a fact finder could find that HMA is an "automobile manufacturer" as defined by the ADDCA.

### 3. HCA May Also Be Sued Under the ADDCA

In light of the broad remedial purposes of the ADDCA, a credit subsidiary is liable where it is a wholly owned subsidiary of the manufacturer, and where its involvement with the dealer is exclusively for the purpose of facilitating the distribution of automobiles manufactured by its parent. *See Colonial Ford, Inc. v. Ford Motor Co.*, 592 F.2d 1126, 1129 (10th Cir. 1979). "As long as a financing company is acting as an agent of the manufacturer in facilitating the manufacturer's automotive business, its actions are cognizable under the ADDCA, even if the financing company was not actually a party to the franchising agreement." *Turnpike Ford, Inc. v. Ford Motor Co.*, 415 F. Supp. 2d 666, 669 (S.D.W.Va. 2006). *Cf. Marquis v. Chrysler Corp.*, 577 F.2d 624, 630 (9th Cir. 1978) ("A manufacturer may be liable notwithstanding it is not a party to the franchise if the party contracting with the dealer is the manufacturer's agent or merely a 'straw man' erected to insulate it from statutory liability." (quoting *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59, 64 (9th Cir. 1973))).

HMA owns 93.4% of HCA's stock. (HCA's Reply Facts ¶ 93.) HMA and HCA share directors and officers. (*Id.* ¶ 89.) HCA provided the construction loan that financed Plaintiffs' construction of their new Hyundai dealership. (Estes Decl. ¶ 19.) And, "[t]o obtain the zero percent financing from HCA on the construction loan, HMA also required that the dealerships utilize HCA as their floor plan source." (*Id.* ¶ 20.) Indeed, HCA's

1 only interaction with Plaintiffs was to facilitate distribution of Hyundai vehicles, therefore,
2 the Court concludes that HCA may be found liable under the ADDCA.

### 4. HCA/HMA Did Not Violate the ADDCA

The ADDCA permits a dealer to bring suit for damages when the automobile manufacturer fails to act in good faith in (1) performing or complying with any of the terms or provisions of the franchise agreement, or (2) terminating, canceling, or not renewing the dealer's franchise. *Autohaus*, 567 F.2d at 910. ~~First,~~ Plaintiffs, neither in their papers nor in oral argument, identified any provision of the franchise agreement that HMA or HCA violated. (*See generally* Pls.' Op. to HMA, Doc. 59, at 17-21.) Hence, the first prong is not relevant to these motions.

Turning to the second prong. ~~Second,~~ Plaintiffs acknowledge that Defendants did not terminate, cancel, or fail to renew Plaintiffs' dealership until October 2010, well after the events described in this action and indeed, approximately ten months after the filing of the action. (Estes Decl. ¶ 63.) Rather, Plaintiffs argue that HMA and HCA constructively terminated their franchise by (1) "bleeding" Plaintiffs' assets and operating capital; (2) misrepresenting to Plaintiffs that HMA and HCA would provide financial support; (3) attempting to force Plaintiffs to sell the dealership to an unacceptable candidate; and (4) refusing to consider Plaintiffs' candidate. (*See* Pls.' Op. to HMA at 17-21.)

The Ninth Circuit has not addressed whether constructive termination is actionable under the ADDCA. Other district courts, however, have assumed without deciding that constructive termination is actionable. *See, e.g.*, *Zeno Buick-GMC, Inc. v. GMC Truck & Coach*, 844 F. Supp. 1340, 1347 (E.D. Ark. 1992); *Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 682 F. Supp. 873, 876 (S.D. Miss. 1987); *Imperial Motors, Inc. v. Chrysler Corp.*, 559 F. Supp. 1312, 1315 (D. Mass. 1983); *Speed Auto Sales, Inc. v. Am. Motors Corp.*, 477 F. Supp. 1193, 1198 (E.D.N.Y. 1979). Assuming, without deciding, that constructive termination is actionable under the ADDCA, summary judgment is nonetheless

1 appropriate, because the actions that Plaintiffs allege were taken by Defendants do not
2 amount to coercive or intimidating conduct as defined by the ADDCA.

3       Plaintiffs' first argument <u>derives</u><s>stems</s> from Plaintiffs' allegations that HCA and
4 HMA diverted and withheld money owed to Merced Hyundai. According to Estes,
5 "[w]hen a customer purchased a vehicle and Merced Hyundai sent the contract in to HCA
6 for funding, HCA would instead divert the proceeds to itself, in satisfaction of the SOT[4],
7 without our knowledge or permission." (Estes Decl. ¶ 46.) Further, HMA diverted monies
8 owed to Merced Hyundai for warranty repairs, factory rebates, dealer cash, and incentives
9 to HCA. (*Id.* ¶ 47.) Plaintiffs allege that they were never provided with an accounting of
10 these diverted funds. (*Id.*)

11       Plaintiffs' assertion that HMA and HCA improperly diverted funds is inconsistent
12 with the written, signed Assignment Agreement between Plaintiffs and Defendants. Under
13 the Assignment Agreement, Plaintiffs transferred all monies owed to Plaintiffs from HMA
14 to HCA in consideration for HCA's continued financing of vehicles. (Frobe Decl., Doc.
15 36-6, Exh. E.) Plaintiffs essentially agreed that HMA, rather than sending money directly
16 to Plaintiffs, could transfer all monies owed to Plaintiffs to HCA in order to pay Plaintiffs'
17 debts to HCA. The Assignment Agreement included dealer holdbacks, excise tax refunds,
18 and any incentives or other dealer subsidies payable to Plaintiffs. (*Id.*) The Agreement
19 authorized HCA to "demand, collect, sue for, receive, receipt for, compromise and give
20 satisfaction for any and all such moneys or payments and to, at any time or times, in
21 [HCA's] sole discretions, direct [HMA] to make payment to [HCA] of the moneys hereby
22 assigned." (*Id.*)

---

[4] In the automotive industry, a car dealer may not purchase all the vehicles that are available for sale on the lot. The dealer may choose to work with a finance company. The finance company will purchase the vehicle from the manufacturer and then provide it to the dealer for sale. The dealer then sells the car and remits payment to the finance company. When a dealer fails to remit payment to the finance company within a set time, that dealer is said to be "out of trust." "SOT" refers to the amount owed by the dealer to the finance company.

9

Therefore, HMA's transfer of monies owed to Plaintiffs to HCA did not "bleed Plaintiffs' assets and operating capital" but rather offset financial obligations Plaintiffs owed to HCA. *See Autohaus*, 567 F.2d at 908 ("It follows then, that with no warranty monies due, [the manufacturer] could not have used them to 'coerce' [the dealer]"). Plaintiffs imply that the Court should not rely on the Assignment Agreement by arguing that "HMA could not identify a single arm's length creditor that was similarly able to reach in and divert funds HMA owed to a dealership." (Pls.' Op. to HMA at 19.) In other words, Plaintiffs imply that there is collusion between HMA and HCA to destroy Plaintiffs' business. Plaintiffs do not substantiate why HMA's failure to identify such a creditor would have any impact on Plaintiffs' obligations under the Assignment Agreement.[5] As there is no evidence to the contrary, it is undisputed that Plaintiffs transferred their interest in refunds from HMA to HCA in the Assignment Agreement, and there is no indication that HMA/HCA's conduct in complying with the Assignment Agreement was coercive or intimidating. *See Autohaus*, 567 F.2d at 911 ("Coercion or intimidation must include a wrongful demand which will result in sanctions if not complied with, and it is necessary to consider not only whether the manufacturer brought pressure to bear on the dealer, but also his reason for doing so." (citation omitted)).

Plaintiffs' fail to support their second argument regarding HMA's and HCA's alleged misrepresentation that HMA and HCA would provide financial support, because oral representations or promises that are not part of the franchise agreement are not actionable under the ADDCA. The ADDCA requires a manufacturer "to act in good faith in performing or complying with any of the terms or provisions *of the franchise*, or in terminating, canceling, or not renewing *the franchise* with said dealer."[6] 15 U.S.C. § 1222

---

[5] Plaintiffs also make the unsupported assertion that "the existence of the Assignment Order – which was obtained through unequal bargaining power – does not shield HMA's conduct." (Pls.' Op. to HMA at 19-20.)

[6] Under the ADDCA, "[t]he term 'franchise' shall mean the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer
    (footnote continued)

(emphasis added). The Seventh Circuit concluded that, in light of the express limitation contained in the ADDCA's plain language, oral representations or promises that are not a part of the written franchise agreement or contract "may not form the basis of a claim of bad faith, coercion or intimidation, under the Act." *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.* 461 F.2d 608, 610 (7th Cir. 1972); *see also S. Rambler Sales, Inc. v. Am. Motors Corp.*, 375 F.2d 932, 934 (5th Cir. 1967). The Court is persuaded by this reasoning and concludes that the alleged misrepresentations or promises by Defendants, that were oral statements not contained within the written franchise agreement, are not actionable under the ADDCA.

In addition, assuming the alleged oral misrepresentations by Defendants were actionable, the Court concludes that Plaintiffs fail to establish any link between the alleged misrepresentations regarding financing and the alleged constructive termination. "When a termination or nonrenewal of a franchise is involved, there must be a 'causal connection' between the dealer's resistance to the coercive conduct and the termination or nonrenewal for there to be a lack of good faith under the [ADDCA]." *Autohaus*, 567 F.2d at 911. Here, Plaintiff has not alleged, nor offered any evidence of a wrongful demand made by Defendants, nor any resistance offered by Plaintiffs. Moreover, even if the Court construes Plaintiffs' allegations that HMA and HCA misrepresented their willingness to provide additional financing to Plaintiff as constituting coercive conduct, Plaintiffs have not offered any evidentiary nexus between the alleged fraud and the alleged constructive termination.

Plaintiffs' third argument, that Defendants attempted to force Plaintiffs to sell the dealership to a certain candidate, is not supported by Plaintiffs' evidence. Although Estes testifies that he felt pressured to enter a buy/sell agreement with a particular candidate, Estes' declaration is contradicted by the very email exchange between Estes and HMA that

---

which purports to fix the legal rights and liabilities of the parties to such agreement or contract." 15 U.S.C. § 1221.

11

is attached as an exhibit to the Estes declaration. In a January 26, 2010 email to HMA, Estes indicated that he was considering three different proposals. (Estes Decl., Exh. G, at 2.) In response, HMA wrote, "I cannot review all of your candidates for the franchise and tell you who to pick. You need to lock in with one of them and get into a buy/sell agreement with them." (*Id.* at 1.) In the email, HMA went on to indicate the characteristics of the "ideal candidate." (*Id.*)

Even if the Court were to accept Estes' declaration that he felt "pressure," he, nonetheless has failed to offer any evidence from which a jury could find "pressure," coercion, or intimidation, for "it is necessary to consider not only whether the manufacturer brought pressure to bear on the dealer, but also his reason for doing so." *Autohaus*, 567 F.2d at 911. HMA's email appears to set forth criteria that HMA could reasonably be expected to have for evaluating potential franchisees (not unlike the criteria that HMA imposed on Estes before Estes took over the Merced dealership in 2002). (Estes Decl. ¶¶ 4-5.) Thus, Plaintiffs have failed to point to evidence that HMA or HCA coerced or intimidated Plaintiffs. More importantly, Plaintiffs closed the doors to Merced Hyundai on January 25, 2010; it is unclear how pressure exerted *after* the dealership had already closed could have contributed to a constructive termination.

Plaintiffs' fourth argument, that HMA and HCA refused to consider Plaintiffs' preferred buyer, is similarly not supported by the evidence. Estes states that he submitted an application for his preferred buyer on November 12, 2009, but that "HMA ignored the application and never acted on it." (Estes Decl. ¶¶ 48-49.) Estes contradicts his assertion in the next line of his declaration, stating that "[HMA] took the position that the application I submitted in November was insufficient because it was not signed." (*Id.*; *see also id.*, Exh. D. (November 12, 2009 email from Estes to Defendants that included an unsigned application).) In addition, the evidence indicates that Estes did not formally present HMA with a signed application for his preferred candidate until January 25, 2010, the same day Plaintiffs closed Merced Hyundai. Thus, the Court concludes that Plaintiffs

have failed to establish that HMA or HCA coerced or intimated Plaintiffs by failing to consider their preferred buyer.

In sum, although HMA and HCA may be sued under the ADDCA, Plaintiffs have failed to establish any coercion or intimidation by HMA or HCA such that Defendants could be liable under the ADDCA. There are no allegations or evidence of any demand, let alone a wrongful demand, nor any causal connection between HMA's and HCA's actions and the alleged constructive termination. Accordingly, the Court GRANTS Defendants' Motions for Summary Judgment on Plaintiffs' First Claim under the ADDCA.

**C. State Claims: Supplemental Jurisdiction**

District courts may decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Here, the parties informed the Court at oral argument that all of Plaintiffs' state-law claims have also been alleged as counterclaims against Defendants in a pending state court action. As the Court has granted Defendants' Motions for Summary Judgment on Plaintiffs' only federal claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Thus, the Court DISMISSES Plaintiffs' six state-law claims, finding that it is in the interest of judicial economy, convenience, fairness, and comity for these claims to be handled in the pending state court action.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS Defendants' Motions for Summary Judgment with respect to Plaintiffs' claim under the ADDCA and DISMISSES Plaintiffs' six remaining claims.

DATED: March 25, 2011          **JOSEPHINE STATON TUCKER**
                               UNITED STATES DISTRICT JUDGE